UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MICHAEL HULTON, *et al.*,

    Plaintiffs,

-v-

BAYERISCHE STAATSGEMALDESAMMLUNGEN, *et al.*,

    Defendants.



No. 16-cv-9360 (RJS)
OPINION AND ORDER

RICHARD J. SULLIVAN, District Judge:

Plaintiffs Michael Hulton and Penny Hulton, the sole heirs of Alfred Flechtheim – a renowned German Jewish art dealer and collector during the 1920s and 1930s – bring this suit against Freistaat Bayern (the "Free State of Bavaria" or "Bavaria") and Bayerische Staatsgemäldesammlungen (the "Bavarian State Paintings Collections" or "BSGS," and together with Bavaria, "Defendants") for the return of several paintings which are now in Defendants' possession. Now before the Court is Defendants' motion to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) and the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1602–1611. For the reasons stated herein, the motion to dismiss is GRANTED.

I. Background[1]

A. Facts

Flechtheim, a pioneer collector and promoter of modern art, operated galleries in Düsseldorf and Berlin during the 1920s and 1930s (Compl. ¶ 48), and represented a range of

---

[1] The facts set forth below are taken from the Complaint (Doc. No. 1 (the "Complaint" or "Compl.")) and documents incorporated therein by reference. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). In ruling on the instant motion, the Court has also considered Defendants' memorandum in support of their motion to dismiss (Doc. No. 26 ("Mem.")), Plaintiffs' opposition (Doc. No. 31 ("Opp'n")), Defendants' reply (Doc. No. 32

notable artists, including Max Beckmann, Paul Klee, and Juan Gris (*id.* ¶¶ 46, 47). Among his collection were the paintings contested in this case (the "Paintings"), including six works by Beckmann (*Duchess of Malvedi* (1926), *Still Life with Cigar Box* (1926), *Still Life with Studio Window* (1931), *Dream—Chinese Fireworks* (1927), *Champagne Still Life* (1929), *Quappi in Blue* (1926)); one work by Gris (*Cruche et verre sur un table* (1916)); and one work by Klee (*Grenzen des Verstandes* (1927)). (*Id.* ¶ 17.)

Upon their rise to power in March 1933, the Nazis began a policy of "Aryanization" – the state-sponsored takeover of Jewish businesses. (*Id.* ¶ 65, 73.) On March 30, 1933, Alex Vömel – who was the employee in charge of Flechtheim's Düsseldorf gallery and a member of the Brownshirts (*id.* ¶¶ 45, 50) – announced "that his gallery would be opening 'in the previous premises of the Flechtheim Gallery.'" (*Id.* ¶ 83.) Around the same time, Nazis "stormed an auction that had been organized by Flechtheim." (*Id.* ¶ 79.) Recognizing the danger he faced, Flechtheim fled to Paris in May 1933. (*Id.* ¶ 81.)

In the summer of 1933, "[i]n order to avoid insolvency as a direct result" of Nazi persecution, "Flechtheim was forced to place his property at the disposal of" Alfred Schulte (*id.* ¶ 85), whom Plaintiffs describe as a "Nazi tax advisor" (*id.* ¶ 20). Schulte "officially took possession of all of Flechtheim's belongings and subsequently sold a good deal of [them] to the benefit of Flechtheim's German creditors and the Nazi state's authorities." (*Id.* at ¶ 85.) Simultaneously, Vömel sold much of Flechtheim's collection through Christopher Bernoulli, "a Swiss art dealer . . . [, thereby] converting for his own profit what clearly belonged to" Flechtheim. (*Id.* ¶ 88.) Plaintiffs allege that although Flechtheim was able to move a portion of his collection abroad before his business was taken, the Paintings at issue here remained in Germany. (*Id.* ¶ 86.)

---

("Reply")), the declarations and exhibits submitted with those briefs, and counsels' letters (Doc. No. 33, 34 ("Plaintiffs' Ltr." and "Defendants' Ltr.")).

2

Nevertheless, it is unclear whether Vömel, Schulte, or someone else disposed of the Paintings; Plaintiffs merely allege that the Paintings were sold in Germany after Flechtheim's flight. (*Id.*) Flechtheim apparently never returned to Germany, dying in London in 1937. (*Id.* ¶ 89.)

The Paintings are now in the possession of BSGS, which "oversees Bavaria's public collections of artworks on display in [its] museums both in[side] and outside of Munich. . . ." (*Id.* at ¶ 14.) The six paintings by Beckmann were donated to BSGS in 1974 by Günther Franke, who claimed to have acquired the paintings "in 1932 or 1933." (*Id.* ¶ 93.) Plaintiffs assert that Franke's claim is false, and that Franke succeeded to the paintings from Vömel, Schulte, or someone else as a result of the persecution of Flechtheim. (*Id.* ¶ 107.) Plaintiffs do not attempt to explain how BSGS came into possession of the Gris and Klee paintings, but assert that the two works "changed hands because of Nazi persecution of their owner [in or after] 1933," implying that BSGS received the paintings from whomever obtained them during the 1930s (or the successor to that person). (*Id.* ¶ 110.)

### B. Procedural History

Plaintiffs commenced this action by filing a complaint on December 5, 2016, asserting claims of replevin, conversion, unjust enrichment, breach of fiduciary duty, and bailment under the common law. (Doc. No. 1.) On November 15, 2017, Defendants filed the instant motion to dismiss with prejudice for lack of subject matter jurisdiction under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1602–1611. (Doc. No. 26.) On January 26, 2018, Plaintiffs filed their opposition. (Doc. No. 31.) The motion was fully briefed on February 23, 2018. (Doc. No. 32.)

### II. LEGAL STANDARD

In the context of a motion to dismiss for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1), the party seeking to invoke the Court's jurisdiction bears the burden of proving that subject matter jurisdiction exists. *Robinson v. Overseas Military Sales*

*Corp.*, 21 F.3d 502, 507 (2d Cir. 1994). "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).

"In reviewing a facial attack to the court's jurisdiction, [the Court] draw[s] all facts – which [it] assume[s] to be true unless contradicted by more specific allegations or documentary evidence – from the complaint and the exhibits attached thereto." *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011). However, to the extent a Rule 12(b)(1) motion places jurisdictional facts in dispute, the Court may consider evidence outside the pleadings. *Id.* Nevertheless, the possibility that the Court might resort to evidence outside the pleadings does not relieve Plaintiffs of their burden to set out factual allegations in the Complaint that amount to "a legally valid claim" under the FSIA and its exceptions. *Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 137 S. Ct. 1312, 1316 (2017).

### III. DISCUSSION

The FSIA provides that, with a few enumerated exceptions, foreign states are immune from suit in the United States. *Saudi Arabia v. Nelson*, 507 U.S. 349, 351 (1993); *see also* 28 U.S.C. § 1605. The parties do not dispute that Bavaria is a political subdivision of a foreign state and that it is therefore covered by the FSIA. (Compl. ¶ 15; Mem. at 3.) *See also Chettri v. Nepal Rastra Bank*, 834 F.3d 50, 55 (2d Cir. 2016); 28 U.S.C. § 1603(a). And while the parties disagree as to whether BSGS is, as Plaintiffs urge, an instrumentality of Bavaria (*see* Compl. ¶ 14; Opp'n at 16–20) or, as Defendants assert, a part of the state itself (Mem. at 9–15), there is no doubt that the FSIA applies to BSGS as well. *See Chettri*, 834 F.3d at 55; 28 U.S.C. § 1603(a). Thus, for the Court to entertain this case, jurisdiction must be authorized under one of the exceptions to the FSIA. *Chettri*, 834 F.3d at 55.

4

Here, Plaintiffs invoke the "takings" exception – also referred to as the "expropriations" exception – set out in 28 U.S.C. § 1605(a)(3) as a basis for jurisdiction. (*See* Opp'n at 20–23.) The takings exception permits federal courts in the United States to exercise jurisdiction over foreign states so long as "rights in property taken in violation of international law are in issue" and either (i) "that property . . . is present in the United States in connection with a commercial activity carried on in the United States by the foreign state" or (ii) "that property . . . is owned or operated by [an] agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States." 28 U.S.C. § 1605(a)(3); *see also Garb v. Poland*, 440 F.3d 579, 588 (2d Cir. 2006) (setting out the elements of the takings exception). It is Plaintiffs' burden to establish that the takings exception is met. *Chettri*, 834 F.3d at 55.

For the purposes of this motion, there is no dispute that property rights are at issue since Plaintiff alleges that the Paintings were stolen from Flechtheim. *See Garb*, 440 F.3d at 588. Accordingly, the applicability of the takings exception – and therefore Plaintiffs' ability to continue this case – turns on whether Plaintiffs have adequately alleged that the Paintings were "taken in violation of international law." *Id.*; *see also* 28 U.S.C. § 1605(a)(3). Although the FSIA does not explicitly define the phrase "taken in violation of international law," the Second Circuit has recognized that it "refers to 'the nationalization or expropriation of property without payment of the prompt adequate and effective compensation required by international law,' including 'takings which are arbitrary or discriminatory in nature.'" *Zappia Middle East Const. Co. Ltd. v. Emirate of Abu Dhabi*, 215 F.3d 247, 251 (2d Cir. 2000) (quoting H.R. Rep. No. 94-1487, at 19 (1976)). Significantly, the taking "must be done by a sovereign – not a private entity" – for this Court to exercise jurisdiction. *Freund v. Republic of France*, 592 F. Supp. 2d 540, 553–54 (S.D.N.Y. 2008), *aff'd sub nom. Freund v. Societe Nationale des Chemins de fer Francais*, 391 F. App'x 939 (2d Cir. 2010); *accord Williams v. Nat'l Gallery of Art, London*, No. 16-cv-6978 (VEC), 2017 WL

5

4221084, at *4 (S.D.N.Y. Sept. 21, 2017) ("[C]onversion by a private individual is not a FSIA taking."), *aff'd* 2018 WL 4293327 (2d Cir. Sept. 10, 2018).

Judge Kaplan's decision in *Orkin v. Swiss Confederation*, 770 F. Supp. 2d 612 (S.D.N.Y. 2011), is instructive in this regard. In *Orkin*, the plaintiff brought suit against the nation of Switzerland to recover a drawing by Vincent van Gogh that his great-grandmother sold to a Swiss art collector for a fraction of its value "to help fund her family's escape" from Nazi persecution. *Id.* at 613–14. Although the art collector "allegedly took advantage" of the seller's "plight and desperation as a Jew in Nazi Germany to purchase the drawing at an artificially low price," Judge Kaplan recognized that the only relevant conduct, for purposes of the takings exception, was undertaken by a private individual. *See id.* at 614, 616–17 ("Plaintiff does not allege that [the art collector] acted in any capacity other than as a private individual."). Thus, Judge Kaplan concluded that the takings exception was inapplicable and dismissed the complaint for lack of jurisdiction, since the works were not taken in violation of international law. *Id.* at 617–18.

Here, as in *Orkin*, Plaintiffs have not alleged that Vömel or Schulte – the individuals who unlawfully converted Flechtheim's property following his flight from persecution – were acting on behalf of the German state or in any official government capacity. Instead, Plaintiffs characterize Vömel as an "opportunis[t] and thie[f]" (Compl. ¶ 75), and do not allege that his taking over the Düsseldorf branch of the Flechtheim gallery was done in his capacity as a member of the Brownshirts. Similarly, although Plaintiffs allege that Schulte was a "Nazi tax advisor" who was "well connected to . . . the Nazi state and its authorities," Plaintiffs do not allege that Schulte acted on behalf of, or at the direction of, the German government when he "took possession of all of Flechtheim's belongings" and sold them. (Compl. ¶¶ 85–86.) The Complaint concedes that Vömel and Schulte acted as profiteers, capitalizing on the wholesale persecution of German Jews to extract unconscionable economic advantages for themselves. Indeed, Plaintiffs explicitly assert that, after

Flechtheim fled Germany, private "opportunists swooped in . . . and converted Flechtheim's property for their own use." (Compl. ¶ 4; *see also id.* ¶ 88 (explaining that Vömel was "converting" Flechtheim's property "for his own profit")). And although Plaintiffs describe a pattern of Nazi propaganda attacking Flechtheim and allege that he fled Germany after recognizing that "his situation was hopeless, as a specific and direct result of the Nazi state's desire and effort to deprive him of the means to survive economically" (*id.* ¶ 81), Plaintiffs also allege that Flechtheim placed his property at Schulte's disposal due to economic duress (*i.e.*, "to avoid insolvency") (*id.* ¶ 85), and never allege that Schulte participated in the government's campaign against Flechtheim. Plaintiffs' allegations here are very different from those in Nazi art cases in which courts have allowed claims to proceed. *Cf. Philipp v. Federal Republic of Germany*, 894 F.3d 406, 409–12 (D.C. Cir. 2018) (permitting a suit to proceed under the takings exception where the plaintiffs alleged forced sales of art to the German State of Prussia that were engineered and directed by Hermann Goering, then the Prime Minister of Prussia); *Cassirer v. Kingdom of Spain*, 616 F.3d 1019, 1021–22 (9th Cir. 2010) (en banc) (allowing a suit to proceed under the takings exception where the plaintiff's ancestor was forced to sell a painting to "an agent of the Nazi government"). Thus, because Plaintiffs have not sufficiently invoked the takings exception to the FSIA, their Complaint must be dismissed.

Although morally unsatisfying, the Court's conclusion is consistent with the structure of the FSIA, which provides foreign states with a broad grant of immunity. *See McKesson Corp. v. Islamic Republic of Iran*, 672 F.3d 1066, 1075 (D.C. Cir. 2012) (characterizing the FSIA's exceptions as "narrowly drawn"); *see also Peterson v. Islamic Republic of Iran*, 627 F.3d 1117, 1124–25 (9th Cir. 2010); *Sampson v. Fed. Republic of Germany*, 250 F.3d 1145, 1155–56 (7th Cir. 2001) ("In interpreting the FSIA, we are mindful that 'judicial resolution of cases bearing significantly on sensitive foreign policy matters . . . might have serious foreign policy implications

which courts are ill-equipped to anticipate or handle.'" (quoting *Frolova v. Union of Soviet Socialist Republics*, 761 F.2d 370, 375 (7th Cir. 1985))). Naturally, the Court is sympathetic to Plaintiffs' moral claim to the Paintings: Flechtheim was deprived of treasured works of art as a direct consequence of the Nazi regime's indefensible and unspeakable Aryanization policies. There is no doubt that the economic opportunism of men like Vömel and Schulte would not have been possible without the Nazi government's promulgation of racist laws and genocidal practices that deprived Jews of the most basic economic and human rights. Surely, it would not be hard to justify and articulate an exception to the FSIA that created a carve-out for victims like Flechtheim and his heirs to take action against the downstream beneficiaries of such policies. Nevertheless, Congress has chosen not to enact such an exception, and it is not the Court's proper place to create one, particularly in light of the "[d]eference to the foreign policy of the political branches" required in the FSIA context. *Sampson*, 250 F.3d at 1156. Accordingly, Plaintiffs' claims must be dismissed.

## IV. CONCLUSION

For the reasons set forth above, the Court reluctantly concludes that it lacks jurisdiction to hear this case and that Defendants' motion to dismiss must be GRANTED. The Clerk of Court is respectfully directed to terminate the motion pending at docket number 25 and to close this case.

SO ORDERED.

Dated:   September 28, 2018
         New York, New York

RICHARD J. SULLIVAN
UNITED STATES DISTRICT JUDGE